[Cite as *In re Z.F.*, 2024-Ohio-1698.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| IN RE: Z.F., M.F., AND R.M. | : | APPEAL NO. C-240050 |
| | | TRIAL NO. F17-921Z |
| | : | *O P I N I O N.* |


Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 3, 2024


*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Robert LeBoeuf*, for Appellee Guardian Ad Litem for the Minor Children,

*Jeffrey J. Cutcher*, for Appellant Father.

**KINSLEY, Judge.**

**{¶1}** Defendant-appellant D.F. ("Father") appeals the judgement of the Hamilton County Juvenile Court granting permanent custody of his children, Z.F., M.F., and R.M., to the Hamilton County Department of Job and Family Services ("HCJFS"). Father asserts that the juvenile court's judgment terminating his parental rights and granting permanent custody of his children to HCJFS was not supported by sufficient evidence and was against the manifest weight of the evidence. After a careful review of the record, we affirm the judgment of the juvenile court.

*Factual and Procedural Background*

<u>*Z.F. and M.F.*</u>

**{¶2}** Father is the parent of twins Z.F. and M.F., who were born on December 19, 2019. Four days after their birth, HCJFS filed a motion for interim custody. At a hearing on the motion, HCJFS explained that Z.F. and M.F. were hospitalized in the NICU and required feeding tubes. The agency was concerned because neither parent had complied with the educational process to learn how to use the twins' feeding tubes, nor had they come to the hospital to feed the children. HCJFS also reported that Father appeared intoxicated during a hospital visit. HCJFS's motion for interim custody was granted, and Z.F. and M.F. were placed with caregivers who were also caring for two older children previously removed from Mother's custody.

**{¶3}** On January 15, 2020, HCJFS filed a complaint for temporary custody of the twins. A guardian ad litem ("G.A.L.") was appointed to make recommendations in the children's best interests, and the G.A.L. recommended that HCJFS receive temporary custody. The recommendation was based in part on Father's known

criminal history, which included carrying a concealed weapon, attempted illegal possession of drug documents, and aggravated drug trafficking.

{¶4}  In May of 2020, HCJFS established a case plan for Father.  The case plan reported concerns about Father's alcohol use stemming largely from the fact that Father appeared to be intoxicated while visiting the twins at the hospital.  HCJFS also indicated that Father had been found on his porch in an intoxicated state early in the morning, had brought alcohol to one of Mother's court hearings, and previously smelled of alcohol at a visit with the children.  At the time of the May 2020 case plan, Father had completed a diagnostic assessment of functioning ("DAF").  Based on his DAF results, the case plan recommended that Father be monitored for alcohol consumption and that he complete random drug screens.

{¶5}  In June 2020, HCJFS submitted a semiannual review.  This report noted that Mother and Father had obtained temporary housing that would be available through October 2020.  Father was not working at the time but was receiving social security income.  Father had also been referred for parenting classes at the Family Nurturing Center ("FNC").  The report indicated that Father had successfully completed the DAF and recommended that he participate in a further domestic-violence assessment.  The report also noted that Father had submitted a negative drug screen.

{¶6}  On September 2, 2020, the juvenile court adjudicated Z.F. and M.F. to be dependent and granted HCJFS temporary custody of the children through January 15, 2021.  The magistrate then supplemented the case plan, requiring Father to: (1) complete a Family Access Integrated Recovery ("FAIR") assessment and follow any recommendations resulting from the assessment; (2) regularly attend visits with the

3

children and demonstrate his ability to provide for the children's needs; and (3) obtain enough income to maintain stable housing.

{¶7} On October 29, 2020, HCJFS filed a motion to extend temporary custody on the basis that Father was making progress towards the case plan. More specifically, the motion explained that Father was engaging in parenting classes, complying with random urine screens, and attending visitation with the children.

{¶8} On December 1, 2020, HCJFS filed another semiannual review. At this point, Father's progress towards regaining custody of the twins began to stall. HCJFS remained concerned about Father's alcohol use, because he had submitted one positive urine screen and refused three others. There was also a new concern raised with regard to Father's anger and aggression. The report also indicated that Father had stopped making progress towards the case plan. He had stopped participating in services and refused to complete an updated DAF. HCJFS also noted that Father had appeared to be intoxicated when a caseworker made an unannounced visit and inappropriately used profanity in text messages to the caseworker. Despite being made aware of a November 25, 2020 review meeting by text message, Father failed to attend.

{¶9} On December 22, 2020, the parties agreed to extend HCJFS's temporary custody of Z.F. and M.F. to July 15, 2021. In the order extending temporary custody, the magistrate noted that both parents had completed diagnostic assessments, but were resistant to following through with the resulting recommendations.

{¶10} On May 3, 2021, HCJFS filed another semiannual review. Its report documented ongoing concerns with Father's alcohol use and his ability to provide for

4

the twins' basic needs, as well as Father's documented aggressive behavior towards Mother. Although Father had completed the FAIR assessment, he failed to submit to the drug screens recommended by that assessment. Father also initially declined to attend parenting classes at FNC, but had recently contacted the agency to reengage. The review also documented an incident in which Father smacked a wall in the presence of a caseworker because he was upset about his case plan.

{¶11} On May 3, 2021, HCJFS filed a motion for permanent custody of Z.F. and M.F.

### *Birth of R.M.*

{¶12} On March 8, 2022, R.M. was born. Two days later, on March 10, 2022, HCJFS sought and was granted interim custody of R.M. R.M. was then placed with the same caregivers as his siblings. HCJFS also filed for an initial disposition of permanent custody of R.M.

{¶13} On May 2, 2022, another semiannual review was filed, which included R.M. The review noted some improvement in Father's visitation, that both parents had secured stable housing, and that the parents were supporting themselves with social security income. However, the review documented an ongoing concern about violence in the home based on Mother's allegation that Father had threatened her with a gun. The review further noted that, on April 13, 2022, Father threatened physical harm to the HCJFS caseworker assigned to the family.

{¶14} On August 5, 2022, R.M. was added to the existing case plan for Z.F. and M.F., and on August 30, 2022, R.M. was adjudicated dependent.

*Permanent-Custody Hearing*

{¶15} On September 21, 2022, the magistrate consolidated and heard the pending permanent-custody motions for R.M., Z.F., and M.F. The following witnesses testified at the hearing.

{¶16} Jacqueline Fox, a family resource specialist at the JusticeWorks visitation center, testified about the parents' visits with the children at her agency. She explained that, in one visit she observed, the parents were attentive to R.M., but struggled to interact with Z.F. and M.F. Fox further testified that when the parents arrived for their second visit, they smelled strongly of marijuana, and Father was stumbling around, dropping his belongings. Fox reported that, when confronted, the parents yelled and threatened staff members. Due to their reactions, Fox explained that JusticeWorks determined that it was no longer safe to host visitation. According to Fox, JusticeWorks offered the parents an opportunity to sign a behavioral contract and restart visitation; however, neither parent showed up for the meeting.

{¶17} Bobby Thompson, the family's HCJFS caseworker, also testified. Thompson reported that Father failed to complete a required domestic-violence assessment, and he testified to the basis for requiring the evaluation, namely the turbulent relationship between Mother and Father, Father's aggression towards Thompson, Father's tone with Mother, and the reported gun incident between Father and Mother. Thompson further testified that he provided more transportation support, like gas cards, than was typical to help Father and Mother. Thompson also opined that Father was "not doing well" when asked about Father's current progress. Regarding the children's current status, Thompson testified that all of the children

were bonded to their current caregivers and to each other. Thompson stated that HCJFS was seeking permanent custody because of both parents' lack of progress.

{¶18} Father also testified. On cross-examination, Father admitted to limited compliance with the drug screenings requested by HCJFS, to being discharged from both parenting classes and visitation due to absences, and to refusing a domestic-violence assessment. Father stated that he lacked ongoing stable housing, but was living with Mother and his brother, who had not been subject to a background check by HCJFS. Father further testified that, from his perspective, the case concerned Mother's actions, not his own. Therefore, he thought that he should not be expected to abide by the case plan. Father reserved further testimony for his case-in-chief.

{¶19} The permanent-custody hearing was continued in progress to November 23, 2022. Father and Mother failed to appear at the hearing that day, despite both being set to testify. Counsel for each parent requested a continuance, which the magistrate denied. On December 4, 2022, both parents filed objections and motions to set aside the November 23 continuance denial, citing the recent death of Father's mother as the reason they had not appeared in court.

*Magistrate's Decision Granting Permanent Custody*

{¶20} On January 4, 2023, the magistrate granted permanent custody of all three children to HCJFS. Regarding R.M., the magistrate determined that R.M. could not or should be placed with either parent under R.C. 2151.414(E). This decision was based upon the fact that the parents lived in a one-bedroom apartment with an unidentified male, Mother's mental-health status, Father's presumed alcoholism, and concerns about domestic violence between the parents.

**{¶21}** Regarding Z.F. and M.F., the magistrate determined that the children had been in the temporary custody of HCJFS for 12 of the preceding 22 consecutive months, which satisfied R.C. 2151.414(B)(1)(d). In support of this conclusion, the magistrate found that the twins had been in the temporary custody of HCJFS since "the final days of February of 2020." This meant that the children had been in temporary custody for 15 months at the time the motion for permanent custody was filed on May 3, 2021.

**{¶22}** The magistrate then considered the best-interest factors of R.C. 2151.414(D)(1) and concluded that permanent custody was in the children's best interest. In this regard, the magistrate noted that the children shared the same custodial history; they all lived in the same house, along with other half-siblings also born to Mother. Regarding the interrelationship between the children and the parents, the magistrate did not believe the parents would cause intentional harm to the children, but emphasized that the parents were not currently visiting the children. The magistrate also noted concerns regarding Father's ongoing issues with alcoholism and propensity for domestic violence.

**{¶23}** The magistrate further found that there was clear and convincing evidence that the parents did "not have sufficient attachment to the children to alter their behavior" based on the parents' general resistance to case planning, irregular attendance at visitation, and irregular attendance at court. The magistrate also found that the current placement was in the children's best interest because they were living with half-siblings that had already been adopted into the home, and the children were bonded to the caregivers and each other.

**{¶24}** Finally, the magistrate noted that Father "indicated * * * a lack of self-awareness. Despite the stipulated facts he repeatedly stated that the case was not about him." The magistrate also noted that Father consistently sought to attribute the situation to Mother and deflect responsibility for his role in the family's involvement with HCJFS.

*Objection to the Magistrate's Decision*

**{¶25}** On January 13, 2023, Father objected to the magistrate's permanent-custody decision on the grounds that his previous objection to the November 23, 2022 denial of a continuance was still pending.

**{¶26}** On February 22, 2023, the juvenile court found that the parents had good cause for missing the November 23, 2022 hearing, and therefore, granted Father's initial objection in part. The juvenile court then remanded the matter to the magistrate for the limited purpose of allowing the parents to present evidence in opposition to HCJFS's permanent-custody motion. The juvenile court held the magistrate's January 4, 2023 decision in abeyance while the matter was on remand.

**{¶27}** On July 11, 2023, the magistrate held a hearing to allow the parents to present evidence. At the hearing, Father testified on his own behalf. In his testimony, Father denied that his conduct was the reason for HCJFS's involvement. Father testified that he had secured housing with his sister, but had not secured an inspection of the residence by HCJFS. He further testified to having familial support to care for his children. Father explained that he suffered from sickle cell disease and that it sometimes prevented him from visiting the children. Father also admitted to missing drug screens, to not completing evaluations, and to requesting that his visitation time with the children be reduced from four hours to two so that he could run errands. He

also testified to taking methadone every day, drinking every day, and mixing alcohol and methadone. Father again expressed that he did not believe that the case was focused on him, but on Mother. And he was adamant in his testimony that he would be able to care for his children appropriately.

{¶28} On July 19, 2023, the magistrate again granted permanent custody to HCJFS. The magistrate reiterated all of the findings made in the previous January 4, 2023 decision. Considering the totality of the evidence, the magistrate found by a clear-and-convincing standard that: (1) the children cannot be placed with the parents within a reasonable time; (2) the children should not be placed with the parents; (3) returning the children to their parents' custody was not in their best interest; and (4) placing the children in the permanent custody of HCJFS was in their best interest.

{¶29} On August 1, 2023, Father objected to the July 19, 2023 decision. In his objection, Father argued that the magistrate had not properly considered the testimony he offered on remand and that he had demonstrated sufficient compliance with the case plan to warrant retaining custody of his children. He attributed the problems in the case to Mother and stated that they were no longer in a relationship or living together as of July 11, 2023. He also argued that, without Mother involved, the children were safe and that he would be able to meet all of their basic needs.

### *Judicial Entry*

{¶30} On January 3, 2024, the juvenile court denied Father's objections and adopted the decision of the magistrate awarding permanent custody to HCJFS. The juvenile court found that Father admitted that he drank "every day," minimized his own behaviors, and had not addressed concerns about his substance use, which undermined his ability to provide an adequate home for the children.

{¶31}  Based on these facts, the juvenile court found that R.M., Z.F., and M.F. could not and should not be placed with Father within a reasonable time pursuant to R.C. 2151.414(B)(2) and (E).  In addition, the juvenile court determined that Z.F. and M.F. were also eligible for permanent custody because they had been in temporary custody for 12 out of 22 consecutive months under R.C. 2151.414(B)(1)(d).

{¶32}  Pursuant to the R.C. 2151.414(D)(1) best-interest factors, the juvenile court found that: (1) although the children were bonded to Father, they were also bonded with their current caregivers and siblings; (2) even though Father had engaged in visitation, his visits were inconsistent, and he had requested his visits to be shortened; (3) the G.A.L. concluded that permanent custody was in the best interest of the children because neither parent showed an ability to properly care for the children or remedied the conditions that led to HCJFS involvement with the children; (4) the children were in need of a legally secure placement, which could only be achieved through a grant of custody to HCJFS; and (5) Father had failed to address concerns  regarding his substance use, his relationship with Mother, his parenting ability, his inconsistent engagement with services, and his inability to provide stable housing.

{¶33}  The juvenile court accordingly found that an award of permanent custody to HCJFS was in Z.F.'s, M.F.'s, and R.M.'s best interest.

{¶34}  Father timely appealed.

### *Sufficiency and Manifest Weight of the Evidence*

{¶35}  Father raises two assignments of error on appeal.  First, he argues that neither the termination of his parental rights nor the grant of permanent custody is supported by sufficient evidence.  Second, he argues that the termination of his

parental rights and the grant of permanent custody are against the manifest weight of the evidence.

**{¶36}** When reviewing a grant of permanent custody to HCJFS, we examine whether there was sufficient evidence to satisfy the clear-and-convincing standard. *In re W.W.*, 1st Dist. Hamilton No. C-110363, 2011-Ohio-4912, ¶ 46; *In re P/W Children*, 1st Dist. Hamilton No. C-200103, 2020-Ohio-3513, ¶ 27. We will accept the trial court's factual determinations if they are supported by "some competent and credible evidence." *In re W.W.* at ¶ 46. Nonetheless, "whether the evidence is sufficient to sustain the judgment is a question of law," which we review de novo. *In re A.B.*, 1st Dist. Hamilton No. C-150307, 2015-Ohio-3247, ¶ 15, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 11.

### *Sufficiency of the Evidence*

**{¶37}** In his first assignment of error, Father raises two issues for our review. Father asserts that his recent record of stable housing, steady income, and clean drug screens demonstrated that he could provide a legally secure placement for his children under R.C. 2151.414(D)(1)(d). And Father also claims that the governor's COVID-19 tolling order should apply to the "12-of-22" standard relied on by the juvenile court under R.C. 2151.414(B)(1)(d).

#### *R.C. 2151.414(D)*

**{¶38}** We first consider Father's argument that he had made sufficient progress in securing stable housing and a source of income and in demonstrating a lack of substance abuse to retain custody of his children.

**{¶39}** Following an adjudication of dependency, R.C. 2151.413(A) permits a court to award permanent custody to an agency upon satisfaction of a two-prong test.

*In re S.G.*, 1st Dist. Hamilton No. C-200261, 2020-Ohio-5244, ¶ 31; *In re F.B.,* 1st Dist. Hamilton No. C-200320, 2020-Ohio-5610, ¶ 16. The court may grant permanent custody if it finds, by clear and convincing evidence: (1) that one of the conditions in R.C. 2151.414 (B)(1)(a) through (e) is satisfied; and (2) that a grant of permanent custody is in the child's best interest, pursuant to the factors listed in subsection (D)(1). *See* R.C. 2151.414(B)(1) and (D)(1); *In re F.B.* at ¶ 18. "In conducting the best-interest analysis 'no single factor is given greater weight or heightened significance.' " *Id.* at ¶ 19, quoting *In re P. & H.*, 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 35.

{¶40} To support a finding of permanent custody as an initial disposition, the juvenile court must determine "(1) that the child cannot be placed with either parent within a reasonable time or should not be placed with the parent, using the factors set forth in R.C. 2151.414(E), and (2) that permanent custody is in the best interest of the child based on the factors set forth in R.C. 2151.414(D)(1)." (Internal citations omitted.) *In re L Children*, 1st Dist. Hamilton No. C-220601, 2023-Ohio-1346, ¶ 12.

{¶41} The juvenile court found that all three children could not be placed with either of their parents in a reasonable time under R.C. 2151.414(E).[1] This statutory subsection contains 11 different factors for the juvenile court to assess, although it need only find that one factor disqualifies a parent as a placement to justify its permanent-custody determination under R.C. 2151.414(E). *Id.* at ¶ 16.

{¶42} Here, the juvenile court found that the children could not and should not be placed with Father on the basis of three separate factors contained in R.C. 2151.414(E): (1) (E)(1), which looks at whether the parent has failed to substantially

---

[1] The finding that a child cannot or should not be placed with either parent in a reasonable time also establishes permanent-custody eligibility under R.C. 2151.414(B)(1)(a).

remedy the conditions that caused the child to be placed outside the home; (2) (E)(2), which considers, among other conditions, a parent's chronic chemical dependency that is so severe that it precludes a parent from providing a suitable home for the child; and (3) (E)(4), which takes into account a parent's lack of commitment to a child. Father does not challenge any of these findings on appeal. Thus, the juvenile court had an adequate basis for considering the children eligible for permanent custody.

{¶43} Once the juvenile court determines that a child cannot and should not be placed with a parent under R.C. 2151.414(E), it must then consider the child's best interest using the factors set forth in R.C. 2151.414(D)(1). These factors are:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child

was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a)-(e). No one factor is dispositive in the best-interest calculus. *In re F.B.*, 1st Dist. Hamilton No. C-200320, 2020-Ohio-5610, at ¶ 18.

**{¶44}** In this appeal, Father only challenges the juvenile court's determination with regard to R.C. 2151.414(D)(1)(d) regarding the children's need for a legally secure placement. But the juvenile court made extensive findings under R.C. 2151.414(D)(1)(a) through (c)—including the limited relationship between Father and the children, the fact that the children had been in the temporary custody of HCJFS and not with either parent since birth, and the G.A.L.'s recommendation on behalf of the children that permanent custody be granted—none of which Father disputes. Thus, even if we set aside the legally-secure-placement factor described in subsection (d), sufficient unchallenged evidence still supports the juvenile court's best-interest determination under the (a), (b), and (c) subsections. *See In re F.B.* at ¶ 18.

**{¶45}** Moreover, considering Father's argument regarding R.C. 2151.414(D)(1)(d), the juvenile court's consideration of the children's need for a legally secure placement was supported by competent and credible evidence. "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more

15

dependable adults who will provide for the child's needs." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56.

**{¶46}** The record before us establishes that, despite his clear love for his children and desire to be a supportive parent, Father was unable to provide what R.C. 2151.414(D)(1)(d) envisions. To begin, Father lacked consistent stable housing for his children. Over the duration of the case, he lived in various locations with different family members, including Mother. At the time of the last permanent-custody hearing, Father resided with an unknown adult male relative who had not been assessed by HCJFS in a residence that also had not been inspected. The juvenile court did credit Father's social security income as a positive source of financial support for his children, but highlighted ongoing concerns with Father's lack of participation in substance-abuse and domestic-violence assessments that would reveal where treatment programs could help him. Father also inconsistently visited his children, choosing to reduce the length of his visits to run errands, and was reluctant to take accountability for his role in HCJFS's involvement with his family.

**{¶47}** The juvenile court's determination that awarding permanent custody to HCJFS was in children's best interest under R.C. 2151.414(D) was therefore supported by clear and convincing evidence.

### *Governor's Tolling Order*

**{¶48}** Father next challenges the juvenile court's finding under R.C. 2151.414(B)(1)(d) that Z.F. and M.F. had been placed in temporary custody for 12 of 22 consecutive months. He argues that an administrative order issued by the governor in response to the COVID-19 pandemic, *see In re Tolling of Time Requirements Imposed by Rules Promulgated by the Supreme Court & Use of Technology*, 158 Ohio

St.3d 1447, 2020-Ohio-1166, 141 N.E.3d 974, tolled certain legal time requirements from March 26, 2020, to July 30, 2020, and that Z.F.'s and M.F.'s placement in temporary custody during this time period must therefore be excluded from the 12-month calculation.

{¶49} We do not reach the merits of Father's argument regarding the COVID-19 tolling order because the juvenile court's order did not solely rest on the 12-of-22 standard under R.C. 2151.414(B)(1)(d). To support a permanent-custody disposition following a dependency adjudication, the trial court need only find that one of the eligibility requirements in R.C. 2151.414(B)(1) has been satisfied. *In re F.B.,* 1st Dist. Hamilton No. C-200320, 2020-Ohio-5610, at ¶ 18. With regard to Z.F. and M.F., the juvenile court found that they cannot and should not be placed with either parent under R.C. 2151.414(B)(1)(a) and that their time in temporary custody met the 12-of-22 standard. Father does not challenge the finding below that the children could not and should not be placed with either parent. Thus, even if Father were correct that the governor's administrative order tolled the 12-month calculation, the juvenile court's finding that the children were eligible for permanent custody under R.C. 2151.414(B)(1)(a) remains undisturbed.

{¶50} Father's first assignment of error is therefore overruled. Sufficient evidence supported the juvenile court's determination of permanent custody under R.C. 2151.414(D) and (E).

### *Manifest Weight of the Evidence*

{¶51} In his second assignment of error, Father argues that the juvenile court's decision was against the manifest weight of the evidence. More specifically,

Father contends that the juvenile court failed to correctly consider his credibility in overruling his objections to the magistrate's permanent-custody decision.

**{¶52}** In reviewing the manifest weight of the evidence, we consider "whether the trial court lost its way and created such a manifest miscarriage of justice in resolving conflicts in the evidence that its judgment must be reversed." *In re P/W Children*, 1st Dist. Hamilton No. C-200103, 2020-Ohio-3513, at ¶ 27; *In re L Children*, 1st Dist. Hamilton No. C-220601, 2023-Ohio-1346, ¶ 15. In so doing, "we must be mindful that the juvenile court, as the trier of fact, is in the best position to weigh evidence and evaluate testimony." *In re W.E.*, 6th Dist. Lucas No. L-21183, 2021-Ohio-1069, ¶ 82.

**{¶53}** Father offers very little in the way of specifics as to how the juvenile court inappropriately weighed his credibility in reaching its final judgment. While Father argues in general that the court below should have afforded his testimony greater weight, he fails to demonstrate how doing so worked such a manifest miscarriage of justice that we must reverse the juvenile court's decision. Moreover, the juvenile court was in the best position to hear Father's testimony and consider its impact. While crediting Father for positive improvement at times, the court below ultimately determined that permanent custody was in the children's best interest because Father could not provide for them.

**{¶54}** After reviewing the record, we cannot say that the juvenile court lost its way or created a manifest injustice in finding that permanent custody was in Z.F.'s, M.F.'s, and R.M.'s best interest. Accordingly, Father's second assignment of error is overruled.

### *Conclusion*

{¶55} We hold that the juvenile court's judgment awarding permanent custody of Z.F., M.F., and R.M. to HCJFS was supported by sufficient evidence and was not against the manifest weight of the evidence. We accordingly overrule Father's two assignments of error and affirm the judgment of the juvenile court.

Judgment affirmed.

**BERGERON, P.J.**, and **CROUSE, J.**, concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.